IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMPLAINT OF IMPERIAL TOWING    )
INC., as Owner *Pro Hac Vice* and      )
Charterer of the Motor Vessel Carl L.   )    Civil Action No. 11-1371
Johnson, FOR EXONERATION FROM OR )
LIMITATION ON LIABILITY          )    Judge Mark R. Hornak
                                 )

## OPINION

**Mark R. Hornak, United States District Judge**

On April 27, 2011, certain barges broke free from the towboat M/V Carl L. Johnson on the Ohio River near Neville Island, Pennsylvania. Imperial Towing, Inc. ("Imperial") was the owner *pro hac vice* and bare boat charterer of the towboat. In this action, Imperial seeks exoneration from, or a limitation of liability to, various entities that might have suffered damages or losses by this incident under 46 U.S.C. §§ 30501-12 and Rule F of the Supplemental Rules for Admiralty for Maritime Claims. Compl., ECF No. 1. In particular, one of the barges contained steel coils belonging to U.S. Steel Corp. ("U.S. Steel"), the value of which was greatly diminished when the coils sank to the bottom of the Ohio River.

Pending before the Court is Imperial's Motion for Partial Summary Judgment, ECF No. 56, in which Imperial seeks to limit its liability to U.S. Steel for the loss of steel coils to the terms of a limitation on liability clause contained in a contract agreed to by U.S. Steel and a private carrier, American Commercial Barge Line, LLC. ("ACBL").[1] The Court has considered

---

[1] The party to the contract, American Commercial Barge Line, LLC, appears to be the same as one of the counter-claimants in the broader case, American Commercial Line, LLC. *See* Response to Imperial Towing's Motion for Partial Summary Judgment, ECF No. 65, filed by "American Commercial Lines, LLC ("ACL")." The Court will

Imperial's Motion; its Memorandum of Law in Support of the Motion, ECF No. 57; Imperial's

Concise Statement of Material Facts, ECF No. 58; U.S. Steel's Response to the Motion, ECF No.

62; and Brief in Support of Response, ECF No. 64; U.S. Steel's Responsive Concise Statement

of Material Facts, ECF No. 63; Imperial's Response to U.S. Steel's Concise Statement of

Material Facts, ECF No. 66; Imperial's Reply Brief, ECF No. 67; ACBL's Response to the

Motion, ECF No. 65; all exhibits attached to those documents; and conducted a detailed hearing

in open court on the matter on October 17, 2012. For the reasons that follow, Imperial's Motion

is granted.

## I.    BACKGROUND

The central relevant facts are undisputed. Around December 14, 2005, ACBL entered

into a "Contract of Affreightment" with U.S. Steel wherein ACBL agreed to "transport all

tonnage shipped via barge" by U.S. Steel for certain set freight rates. App. Concise Stmt. Mat.

Facts, ECF No. 59, Ex. B, *filed under seal at* ECF No. 61, Ex. B ¶ 3. This contract was renewed

and amended in 2009 and again in 2011. *See id.* The contract gave ACBL considerable discretion

as to the movement of the cargo:

> 12. MOVEMENT OF CARGO: The barge will move only at the convenience of
> Carrier [ACBL], and either singly or with one or more other craft. Carrier shall
> have the right to shift or interchange the tow from one to another towing vessel as
> frequently as it may find it convenient to do so, or to procure towage from any
> other vessel not owned or operated by the carrier; to tie off the tow at any point
> and for any purpose; and to deviate from its route, and visit any port whether or
> not on said route, and in any order.

*Id.* ¶ 12. The Contract also contained a clause both valuing and limiting liability for cargo:

> 15. CARGO VALUATION: In consideration of the bargained for and agreed
> rates set forth herein, it is expressly agreed that the cargo described herein is
> hereby valued at not in excess of $700.00 per ton.
> Carrier [ACBL] shall not be liable for and Shipper [U.S. Steel] hereby agrees to
> release, indemnify, and hold harmless Carrier, its subcontractors, affiliates and the

---

refer to that entity as "ACBL," consistent with the contracts at issue here.

vessels employed by it or them, in the performance of the cargo movements hereunder for any loss or damage to or expense in connection with any article shipped in an amount exceeding the per ton valuation set forth above multiplied by the actual weight in tons (2,000 lbs.) or fraction of tons. In no case shall Carrier's liability exceed the actual value of the article shipped.

*Id.* ¶ 15. It is primarily the terms of Paragraph 15 that are at issue between the parties here.[2]

ACBL then entered into a "Distribution Agreement" with Campbell Transport Company and/or its affiliate C & C Marine Maintenance Company (collectively, "CTC"), wherein CTC agreed to provide ACBL with "exclusive barge distribution services" on the Allegheny, Monongahela, and Upper Ohio Rivers. ECF No. 61, Ex. C.

In the final link in the chain, CTC entered into a "Fully Found Charter" agreement with Imperial, wherein Imperial agreed "to place in the exclusive service of CTC on a fully found basis the Towboat(s)." ECF No. 61, Ex. D ¶ 1. The agreement provided: "The Charter shall be fully found for the purposes of towing barges upon the instructions of CTC to various destinations on the inland rivers of the United States." *Id.* One of the vessels chartered under that agreement was the M/V Carl L. Johnson. *Id.* Sch. I.

On April 27, 2011, the M/V Carl L. Johnson was towing a number of barges on the Ohio River, one of which was ACBL's barge ACL 01532. Barge 01532 was loaded with steel coils that were owned solely by U.S. Steel. The barge was carrying approximately 1,566.49 tons of steel coils which U.S. Steel values at amounts ranging from $991 to $1,212 per net ton. *See* Complainant's Concise Stmt. Mat. Facts, ECF No. 58 ¶ 3; U.S. Steel's Responsive Concise Stmt. Mat. Facts, ECF No. 63 ¶ 3; Ex. A. at 1.[3] That day, the M/V Carl L. Johnson was involved in an incident near Neville Island where a number of barges, including ACL 01532, broke free from

---

[2] The contract does not define the terms "subcontractors" or "vessels employed." *See id.*

[3] The parties have not stipulated to the exact weight of steel coils or their original value, and the Court does not find these facts here. Rather, the Court finds it helpful to relay the approximations given by the parties as of this date to illustrate the practical parameters of any limitation on liability.

the vessel's tow.  That barge, along with the steel coils on it, sank in the Ohio River. The steel coils were subsequently recovered from the river by or on behalf of ACBL, and sold by ACBL for a salvage value of $640,348.26. ECF No. 63 ¶¶ 15-17; Imperial's Resp. U.S. Steel's Responsive Concise Stmt. Mat. Facts, ECF No. 66 ¶¶ 15-17.

Imperial filed a Complaint in this Court on October 27, 2011, seeking exoneration from or limitation on its liability to U.S. Steel and various other entities who may have suffered damages as a result of the April 27 incident under 46 U.S.C. §§ 30501-12 and Rule F of the Supplemental Rules for Admiralty for Maritime Claims. ECF No. 1 at 1. U.S. Steel filed a cross claim against Imperial for $1,756,482.00 in damages. ECF No. 58 at ¶ 2, ECF No. 63 at ¶ 2; Ans. & Defenses Compl. Imperial & Claim & Cross-cls. U.S. Steel, ECF No. 37 at 6.

Imperial filed the instant Motion for Partial Summary Judgment in Regard to Damage Claim of U.S. Steel, arguing that it is entitled to the benefit of the $700 per ton valuation and limitation clause in Paragraph 15 of the Contract of Affreightment between U.S. Steel and ACBL. ECF No. 56. Imperial seeks a determination that (1) its liability is "limited to a maximum of $700 per ton of cargo" and (2) that U.S. Steel "is not entitled to also claim salvage proceeds." Proposed Order, ECF No. 56, Ex. 1. U.S. Steel argues in response that the valuation and limitation provisions of the Contract of Affreightment do not extend down to Imperial, and that even if that clause were to apply, U.S. Steel would be entitled to recover salvage proceeds on top of the $700 per ton limitation. ECF No. 62 at 1.

## II.    DISCUSSION

### A. <u>Legal Standard</u>

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 162 (3d Cir. 2001). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Because the contract here "is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22 (2004) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)). When interpreting the terms of a contract, a court may grant summary judgment if the terms are not ambiguous, i.e., if they are "subject to only one reasonable interpretation." *Emerson*, 253 F.3d at 163-64; *see also Kirby*, 543 U.S. at 21-22 (construing meaning of terms in limitation on liability clause under summary judgment standard). Before a court determines whether a contract is ambiguous, it "must consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Emerson*, 253 F.3d at 164 (internal quotation omitted).

## B. The Himalaya Clause

The central question presented is how far the protections of the Himalaya Clause contained in Paragraph 15 of the Contract of Affreightment between U.S. Steel and ACBL extend, and specifically, whether they extend to Imperial. A "Himalaya clause" is a contractual provision extending maritime liability limitations to downstream parties expected to take part in the contract's execution. *Kirby*, 543 U.S. at 20.[4] In *Kirby*, the Supreme Court held that "there is

---

[4] Himalaya Clauses take their name from an English case involving a steamship named *Himalaya*. *Kirby*, 543 U.S. at 20 n.2. In modern American usage, they are most frequently used in the shipping industry to extend the limitations on liability already guaranteed to a carrier or vessel by statute, the Carriage of Goods by Sea Act, 46 U.S.C.A. § 30701 *et seq.* ("COGSA"), to a downstream subcontractor, agent, or independent contractor. *See Kirby*, 543 U.S. at 14. However, the Court finds no meaningful distinction, nor has either party urged the Court to find one, between a Himalaya Clause that extends a limitation of liability provided by COGSA and one that extends a limitation of liability provided by private contract. *See Mazda Motors of Am., Inc. v. M/V Cougar Ace*, 565 F.3d 573

no special rule for Himalaya Clauses," and that they "must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Id.* In so doing, the Court rejected some courts of appeals' adoption of a general principle of "narrow construction" for Himalaya clauses, which would require "a special degree of linguistic specificity" and/or "privity of contract" between the carrier and the party seeking protection under the clause. *Id.* at 31 (citing *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327, 332 (2d Cir. 1993)).[5]

The parties here argue over the meaning of the Himalaya Clause set forth in this Contract of Affreightment. In relevant part, Paragraph 15 states:

> Carrier [ACBL] shall not be liable for and Shipper [U.S. Steel] hereby agrees to release, indemnify, and hold harmless *Carrier, its subcontractors, affiliates and the vessels employed by it or them, in the performance of the cargo movements hereunder* for any loss or damage to or expense in connection with any article shipped in an amount exceeding the per ton valuation set forth above . . . .

ECF No. 61 Ex. B ¶ 15 (emphasis added). Thus, the focused question before the Court is whether Imperial and the M/V Carl L. Johnson can be considered (1) ACBL's "subcontractor" or (2) a "vessel[]" employed by it [ACBL] or them [ACBL's subcontractors]." *Id.* If Imperial is either, it can invoke the protection of the Himalaya Clause. For ease of analysis, the Court will address these two interpretations in reverse order.

### 1. *"Vessel Employed"*

As is further discussed below, U.S. Steel asserts that while CTC would be ACBL's "subcontractor" under the contract, Imperial would not. U.S. Steel also asserts that neither ACBL nor CTC "employed" the M/V Carl L. Johnson and that only Imperial, as the entity who owned and operated the boat, "employed" it. Therefore, U.S. Steel concludes that the M/V Carl L.

---

(9th Cir. 2009) (construing Himalaya Clause that expanded benefit of a privately negotiated forum selection clause and not of substantive liability provisions of COGSA).

[5] At oral argument, counsel for all parties were uniform in the view that they were aware of no case interpreting the specific language contained in Paragraph 15.

Johnson was not a "vessel employed by it [ACBL] or them [its subcontractor]" under the Himalaya Clause. However, regardless of whether Imperial was a "subcontractor," U.S. Steel offers no support for the assertion that ACBL and/or CTC did not "employ" the M/V Carl L. Johnson. *See* ECF No. 54 at 11.[6] The Court concludes that under at least two different principal meanings of the word "employ," the M/V Carl L. Johnson was "employed" by ACBL and/or CTC.

Black's Law Dictionary (9th ed. 2009) defines "employ" as "1. To make use of. 2. To hire. 3. To use as an agent or substitute in transacting business. 4. To commission and entrust with the performance of certain acts or functions or with the management of one's affairs."[7] The Court finds applying the first definition of "employ" results in the most logical reading of the contract here, which provides coverage for "Carrier, its subcontractors, affiliates and the vessels *employed by it or them, in the performance of the cargo movements hereunder.*" ECF No. 61 Ex. B ¶ 15 (emphasis added). The emphasized clause suggests a purposive meaning of the word "employ"; i.e., that it covers a vessel that will be "used" to perform the cargo movements described in the Contract of Affreightment.

---

[6] Neither party has advanced case law that suggests a particular meaning of the phrase "employ a vessel." Although the Second Circuit in both *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313 (2d Cir. 2006) and *Toyomenka, Inc. v. S.S. Tosaharu Maru*, 523 F.2d 518 (2d Cir.1975) construed narrowly the phrase "employed by the Carrier," the use of the phrase in both differs markedly from its use here. *See American Home*, 446 F.3d at 317 ("Owners and operators of vessels (other than the Carirer), Underlying carriers, stevedores, terminal and groupage operators, road and rail transport operators and any independent contractors *employed by the carrier*"); *Toyomenka*, 523 F.2d at 521 ("all servants, agents and independent contractors . . . used or *employed by the Carrier* for the purpose of or in connection with the performance of any of the Carrier's obligations"; explicitly rejecting "made use of" interpretation). The clauses in those cases refer to *entities or people* "employed by the carrier," while the instant case involves "*vessels* employed." To "employ" a *person* more naturally means to "hire" him, while to "employ" an *object* more naturally means to "make use of" it. *Toyomenka* is further distinguishable because the court also rested its holding on another sentence in the operative clause that suggested a limited reading. *Id.* Finally, the Court notes that the *Toyomenka* court's narrow interpretation also at least in part rested upon the proposition that a Himalaya Clause "will be strictly construed against the parties whom it is claimed to benefit," *id.*, the very proposition that was rejected in *Kirby*, 543 U.S. at 31. As such, the Court is doubtful as to the continuing validity of the reasoning and holding of *Toyomenka* in the wake of *Kirby*, and does not find it to have persuasive value here. *See* 2A-XVI Benedict on Admiralty § 169[d][3] (Matthew Bender & Co. 2012 ed.).

[7] Definitions (3) and (4) appear to be inapplicable, because they seem to exclusively describe ways in which one would employ a person, rather than an object.

Moreover, the fact that the Contract of Affreightment explicitly permitted an entity other than ACBL to provide the vessel that would be used to carry the steel coils also militates strongly in favor of this meaning of "employ." The contract obligated ACBL "to transport all tonnage shipped via barge . . . involving the origin and destination combinations hereunder." Ex. B ¶ 3. In so doing, ACBL had the right "to procure towage from *any* other vessel not owned or operated by [ACBL]." *Id.* ¶ 12 (emphasis added). *See Kirby*, 543 U.S. at 31 (giving considerable weight to the "expansive meaning" of the word "any"). Also, the Himalaya Clause's use of the plural "*vessels* employed by it or them" reinforces that the potential use of a multitude of vessels from various sources was contemplated. Thus, it was plain when the contract was formed that ACBL could at its election "employ," or use, a number of vessels in accomplishing the task with which it was charged in the Contract of Affreightment, with no limitation on how far downstream in the contractual chain this might occur. The Court concludes that this meaning of "employ" is the reasonable interpretation of the involved text, and that ACBL "employed" the M/V Carl L. Johnson to fulfill its contractual obligations.[8]

However, even if definition (2) of the word "employ" – "hire" – more accurately describes its meaning in Paragraph 15, the clause still covers the M/V Carl L. Johnson. The phrase "employed by it or them" must at least refer to ACBL and its first-tier subcontractors. U.S. Steel does not argue that CTC was not a subcontractor within the meaning of the Himalaya Clause. *See* ECF No. 64 at 10-11. Thus, Imperial would also be covered if CTC "hired" the M/V Carl L. Johnson via Imperial. Black's Law Dictionary (9th ed. 2009) defines "hire" as "2. To procure the temporary use of property, usu. at a set price."

The agreement between CTC and Imperial was memorialized in the Fully Found Charter.

---

[8] While Imperial itself could well be considered one of the parties who "employed" the M/V Carl L. Johnson by making use of it under this broader definition, that in no way allows, let alone compels, the conclusion that Imperial was the *only* entity who "made use of" the M/V Carl L. Johnson.

Pursuant to that agreement, Imperial agreed to "place in the exclusive service of CTC on a fully Found basis the Towboat(s)," ECF No. 61 Ex. D ¶ 1, which would be crewed and operated only by Imperial, *id.* ¶ 8, to tow barges provided by CTC. The contract explicitly lists the M/V Carl L. Johnston as one of the chartered Towboats. *Id.* Sch. I ¶ 2. Specifically, "CTC covenant[ed] and agree[d] to pay [Imperial], as consideration for hiring the Towboat(s), Charter Hire payments." Ex. D ¶ 15. This language demonstrates that CTC "hired" the M/V Carl L. Johnson to tow its barges, and thus that towboat was a "vessel employed" by a carrier or subcontractor under *either* definition, i.e. (1) "made use of", or (2) "hired."[9]

Indeed, the only possible way to read the word "employ" in the way suggested by U.S. Steel is to conclude that "employ a vessel" had the *specific and exclusive* contractual meaning akin to 'to own, operate, and/or equip a vessel.' However, the Court is not aware of, nor has U.S. Steel provided, any authority suggesting that "employ a vessel" in this context is a term of art in the nautical community that carries that (and only that) particular meaning. Nor has U.S. Steel pointed to any record evidence demonstrating that that meaning was the one contemplated by U.S. Steel and ACBL in the formation of this contract. Nor is there any dictionary or case law definition of "employ" that in any way suggests such a narrow reading. Thus, in the absence of any record evidence that demonstrates why the Court should adopt this specific definition of the word "employ," the Court declines to do so.

The result reached by the Court comports especially well with Himalaya Clause jurisprudence that considers "the nature of the services performed compared to the carrier's responsibility under the carriage contract." *Mazda*, 565 F.3d at 578 (citations omitted). In *Mazda*, the Ninth Circuit interpreted a Himalaya Clause to benefit a vessel, reasoning that because the

---

[9] It is true that if the meaning of a word in a contract is ambiguous, *Emerson*, 253 F.3d at 163-64, its meaning should not be determined at the summary judgment stage. However, summary judgment is still proper here because under either definition, the result is the same.

services performed by the vessel were the same as those that were the Carrier's chief responsibility, the vessel must have been contemplated as a beneficiary. *Id.* at 578-79 ("[D]efendant vessel's services were even more obviously necessary for the completion of the carriage; the parties must have anticipated that the vessel's services would be necessary for performing a contract for ocean carriage."). The Court in *Kirby* also considered the nature of services performed by the Himalaya Clause beneficiary, a land carrier. The Court reasoned that because the ultimate destination of the goods, Huntsville, Alabama, was located some 366 miles from the Savannah, Georgia port of discharge, the parties "must have anticipated that a land carrier's services would be necessary for the contract's performance." 543 U.S. at 32.

The same reasoning applies here. The services provided by Imperial and the M/V Carl L. Johnson (towing U.S. Steel's goods) were the very essence of ACBL's responsibilities under the Contract of Affreightment. The Contract of Affreightment (1) obviously required the use of a vessel to transport U.S. Steel's goods by river and (2) specifically permitted ACBL to use "any vessel" owned and operated by another entity in the stream of carriage. This makes it apparent that a vessel owner would be an intended Himalaya Clause beneficiary, just as in *Mazda* and *a fortiori* from *Kirby*. To read the Himalaya Clause as suggesting that the parties contemplated that a vessel (that was obviously necessary to move the steel coils) would be subject to a limitation on liability *only if* it was *owned and operated by* ACBL or ACBL's first-tier subcontractor, would require reading *into* the contract limiting terms that are nowhere to be found, in derogation of *Kirby*.[10]

---

[10] This result is further bolstered by examination of the context in which Himalaya Clause disputes often arise. The vast majority of Himalaya Clause cases examine whether the clause extends the $500 per package limitation of COGSA to a land carrier or a stevedore. 46 U.S.C.A. § 30701 n. sec. 4(5); *see, e.g., Kirby*, 543 U.S. at 18 (land carrier), *American Home*, 446 F.3d 313 (land carrier); *Mikinberg*, 988 F.2d at 332 (stevedore); *Toyomenka*, 523 F.2d at 519 (stevedore). *But cf. Mazda*, 565 F.3d at 578 (vessel; examining Himalaya Clause's extension not of substantive COGSA limitation on liability, but of forum selection clause). The reason that such cases typically do not involve the vessels themselves or their owners is that vessels are already automatically protected by the

2.   *"Subcontractor"*

Although the Court concludes that Imperial is entitled to the protections of the Himalaya

Clause as a "vessel employed" by ACBL and/or CTC, the Court also concludes that Imperial

would be covered as a "subcontractor." Here, U.S. Steel contracted with ACBL (under the

Contract of Affreightment), who contracted with CTC (under the Distribution Agreement), who

contracted with Imperial (under the Fully Found Charter). U.S. Steel argues that, because CTC

is positioned between ACBL and Imperial, Imperial can only be properly considered a second-

tier, or sub-subcontractor, and that the term "its subcontractors" contained in Paragraph 15 only

covers first-tier subcontractors.

In *Kirby*, the Supreme Court extended the protections of a Himalaya Clause to a "sub-

subcontractor." 543 U.S. at 30. The language of the clause covered "any servant, agent, or other

person (included any independent contractor) whose services have been used in order to perform

the contract." *Id.* As noted above, the Court explicitly rejected rules of strict construction and

contractual privity in Himalaya Clause interpretation. *Id.* at 30-31. Although the Supreme Court

did not interpret any contractual definition of "subcontractor" in reaching its holding, and

although it did note the importance of the word "any" in its interpretation, *id.*, the result reached

is also highly instructive, because it demonstrates the extension of a Himalaya Clause to an entity

in the identical contractual position as Imperial.

Moreover, U.S. Steel can point to no language in the Contract of Affreightment

suggesting its preferred limitation on the term "subcontractor." U.S. Steel relies primarily on

*American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313 (2d Cir.

---

substantive provisions of COGSA (regardless of who contracts for them), obviating the need for a Himalaya Clause
to extend protection. This fact illustrates the appropriateness of construing the Himalaya Clause here to cover
vessels like the M/V Carl L. Johnson, because it comports with the protections of vessels already embedded in
COGSA, which is intimately related to the cargo movements here.

2006), for the proposition that the term "subcontractor" in a Himalaya clause refers to a first-tier subcontractor only. However, *American Home* is readily distinguishable because the contract in that case included an internal definition of "subcontractor" that was the source of the Second Circuit's narrowing interpretation.

In *American Home*, the Second Circuit held that a sub-subcontractor could receive the benefit of the term "Subcontractor" in a Himalaya Clause, but only because the first-tier subcontractor was the direct agent of the carrier under principles of agency law. However, the agreement between the shipper and the carrier contained a provision defining "Sub-Contractor" as "Owners and operators of vessels (other than the Carrier), Underlying carriers, stevedores, terminal and groupage operators, road and rail transport operators and any independent contractors *employed by the Carrier* in the performance of the Carriage." *Id.* at 317 (emphasis added). The court explained that the "employed by the Carrier" language was central to its analysis in construing the clause narrowly. *Id.* at 318 ("[I]t is clear that BNSF was 'employed by' Hapag Lloyd and thus entitled to limit its liability").[11] Unlike the contract in *American Home*, the Contract of Affreightment here contained no provision defining the term "subcontractor" and limiting it only to entities "employed by the Carrier." Therefore, *American Home* provides no basis to conclude that the word "subcontractor" standing alone in this contract carries the meaning of "first-tier subcontractor."

As with the word "vessels," the use of the plural "its subcontractors" demonstrates that the involvement of *multiple subcontractors* was contemplated by the parties. The Court concludes that the possessive phrase "its subcontractors" used here is not, on its own, specific enough to provide a limitation for first-tier subcontractors only. Nor is the Court persuaded by

---

[11] The Second Circuit cited the "employed by the Carrier" language in *Toyomenka* in support of this proposition. *Id.* (citing 423 F.3d at 521).

12

U.S. Steel's argument that the word "subcontractor" is inherently limited to a "first-tier subcontractor" under the definition in Black's Law Dictionary as "[o]ne who is awarded a portion of an existing contract by a contractor, esp. a general contractor." ECF No. 17 at 10.

There is no principled reason why CTC was considered to have been awarded a portion of the Contract of Affreightment by taking on the Ohio River Valley portion of ACBL's responsibilities for shipping the steel coils on its barges, but Imperial was *not* awarded a portion of that initial contract by taking on CTC's responsibilities for actually shipping the barges containing the coils by means of its towboat(s). Both Imperial and CTC were performing duties that constituted a part – the central part – of ACBL's Contract of Affreightment with U.S. Steel: to carry U.S. Steel's coils from point A on the river to point B on the river. In the absence of internal contract language limiting the meaning of "subcontractors" to "first-tier subcontractors," this Court is unwilling to impose that limitation externally, especially because to do so would require adhering to the very rules of "linguistic specificity" and "privity of contract" eschewed by *Kirby. See* 543 U.S. at 31. As noted above, the language of Paragraph 15 does not demonstrate that the parties intended that the vessel actually carrying U.S. Steel's coils would not be subject to the limitation on liability contained in ¶ 15, whose shipping services are the very essence of the contract. *See id.* at 32 ("It is clear to us that a railroad like Norfolk was an intended beneficiary of the ICC bill's broadly written Himalaya Clause.").

Justice O'Connor, writing for a unanimous Court in *Kirby*, discussed the broader context of limitations on liability covering multiple parties in the stream of commerce. First, the *Kirby* Court noted the importance of federal maritime jurisdiction in allowing for "the protection of maritime *commerce*" and praised the "efficient choice" of cargo owners to contract with a single carrier, as opposed to negotiating separate contracts for each leg of the journey. *Id.* at 25-26

(emphasis in original). Later, the Court discussed the importance of a uniform application of contractual limitations on liability, given that many maritime shipments involve the use of multiple carriers. Further, the *Kirby* Court recognized that if downstream carriers had to ascertain in advance the consequences of their precise level in the chain of commerce based on a highly-nuanced reading of the verbiage of the Himalaya clause in order to determine whether they would receive the protections of a stated valuation or limitation on liability, the task of such information gathering would be very costly or impossible. *Id.* at 34-35.

The result here is in accord with those broader considerations in *Kirby*. Indeed, it also appears that CTC was both the first-tier subcontractor of U.S. Steel and the primary Carrier for Marathon Petroleum Company LP, also a party to this case. *See* Marathon Petrol. Co.'s Ans. & Claim Damages, ECF No. 34 at 9. Again, Imperial agreed in the Fully Found Charter to provide its towboats exclusively for the service of CTC. Thus, to determine whether its liability for damages to any of the goods it carried would be limited, a prudent carrier in Imperial's position might be required to investigate each chain of contractual relationships and negotiate different rates for its towing services, depending on what entity's goods happened to be on the barges Imperial was towing, and how proximate CTC's contractual relationship was to each of them. While this Court is mindful that the touchstone of a Himalaya Clause analysis under *Kirby* is to construe the clause in neither an unduly narrow nor unduly broad manner, but consistent with the plain meaning of the words it contains, *see* 543 U.S. at 31, the Court notes that the result here is consistent with Supreme Court's holding and reasoning in *Kirby*, and in particular the Court's solicitousness for encouraging uniformity and efficiency in maritime commerce. For these reasons, the Court concludes that Imperial is entitled to the benefits of the Himalaya Clause

contained in Paragraph 15 as the "subcontractor" of ACBL.[12]

In summary, the Court concludes that U.S. Steel and ACBL contemplated that an entity in the position of Imperial, as the owner and operator of the vessel that transported U.S. Steel's goods, would be a beneficiary of the Himalaya Clause contained in ¶ 15 of that agreement. This is because Imperial owned (and the M/V Carl L. Johnson was) a "vessel employed" by ACBL and/or CTC under any fair meaning of the word "employ," and because Imperial was a "subcontractor" of ACBL. Therefore, Complainant Imperial's Motion for Partial Summary Judgment is granted, and the provisions of Paragraph 15 of the Contract of Affreightment apply to Imperial.

### C. Salvage Proceeds

In addition to disputing whether the stated valuation and limitation of liability contained in Paragraph 15 apply to Imperial at all, certain of the parties also contest the effect of the salvage proceeds from the recovered steel coils on Imperial's damage exposure. Imperial seeks partial summary judgment to limit its liability "to a maximum of $700 per ton of cargo, less any salvage proceeds." ECF No. 57 at 11. U.S. Steel counters that the "measure of USS' damages should [not] be reduced by the amount of salvage proceeds if the $700/ton limitation of liability is held to apply," ECF No. 64 at 3.

U.S. Steel filed a claim for $1,756,482.00 for damages to its steel coils. ECF No. 58 at ¶ 2, ECF No. 63 at ¶ 2. Based on the documentation provided by the parties, they appear to agree

---

[12] *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586 (1978) is not to the contrary. There, the Court considered the reach of the term "subcontractor" in the context of the payment bond protections of the Miller Act, 40 U.S.C. § 270a *et seq*,. and concluded based on that statute's legislative history that it only extended to first-tier subcontractors, as a matter of statutory construction. *Id.* at 591-92, 594. There is, of course, no legislative enactment, or history, which constrains the definition of the term "subcontractor" as used in Paragraph 15. Further, as the dissent in *Bateman* recognized, outside of the Miller Act context, the term "subcontractor" is often applied to those who have accepted contractual responsibilities more distant from the prime contract than only the first tier. *Id.* at 601-02 (Stevens, J., dissenting).

that U.S. Steel lost 1,566.49 tons of steel coils at actual values ranging from $991 and $1,212 per net ton from the incident with the M/V Carl L. Johnson. *See* ECF No. 58 at ¶ 3; ECF No. 63 at ¶ 3; ECF No. 61, Ex. A at 1. Thus, approximately 1,566.49 tons lost at $700/ton would cap Imperial's liability to U.S. Steel at $1,096,543.[13] The parties agree that $640,348.26 was recovered in salvage for the recovered steel coils by ACBL. ECF No. 63 ¶ 17; ECF No. 66 ¶ 17.

In maritime law, damages in a total loss situation are calculated at market value of the goods less salvage. *See The Anna Maria*, 15 U.S. 327 (1817); *DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 752 (1st Cir. 1989). U.S. Steel essentially makes two arguments regarding salvage. First, it contends that even if the limitation on liability applies, the "market value" starting point is not determined by the $700/ton valuation limitation in the contract, but rather by the actual public market value of the goods. Thus, "there can be no reduction [from the $700/ton starting point] based on the salvage proceeds." ECF No. 64 at 12. Second, U.S. Steel argues that because it has not itself received the benefit of the approximately $640,000 in salvage proceeds, but rather ACBL has, it would be improper to deduct that salvage amount from U.S. Steel's recovery unless and until it actually receives the proceeds. Based on Imperial's briefing and counsel's position at oral argument, it is the Court's understanding that Imperial agrees with U.S. Steel's second point. *See* ECF No. 67 at 13; ECF No. 56, Ex. 1.

The Court agrees with U.S. Steel's second argument but not with its first. Again, in ¶ 15 of the Contract of Affreightment, U.S. Steel and ACBL agreed:

> 15. CARGO VALUATION: *In consideration of the bargained for and agreed rates set forth herein, it is expressly agreed that the cargo described herein is hereby valued at not in excess of $700.00 per ton.*
> Carrier [ACBL] shall not be liable for and Shipper [U.S. Steel] hereby agrees to release, indemnify, and hold harmless Carrier, its subcontractors, affiliates and the vessels employed by it or them, in the performance of the cargo movements

---

[13] As stated in Part I above, the Court is not here ruling on the actual weight of steel coils lost, nor on the exact calculation of damages.

> hereunder for any loss or damage to or expense in connection with any article shipped *in an amount exceeding the per ton valuation set forth above* multiplied by the actual weight in tons (2,000 lbs.) or fraction of tons. *In no case shall Carrier's liability exceed the actual value of the article shipped.*

ECF No. 61 Ex. B ¶ 15 (emphasis added). The language of the clause demonstrates that $700 per ton is a "valuation" of the cargo between the parties, establishing their express understanding that whatever the value of a ton of cargo outside the contract is, for the purposes of the contract, it is no more than $700. Moreover, the language "in consideration for the bargained for and agreed rates" highlights that the valuation was a material term in the parties' negotiation of the contract.

U.S. Steel argues that the last sentence that states "[i]n no case shall Carrier's liability exceed the actual value of the article shipped" establishes a "clear distinction" between "market value" on the one hand, and the $700/ton valuation on the other, and thus delineates the former, actual market value, as the proper starting point for the salvage rule. *See* ECF No. 64 at 12. The Court finds no reason to read the last sentence in that manner. The plain meaning of that language is that if the value of the steel is *less than* $700/ton, the actual value will be the cap rather than the contractual $700/ton rate.

In essence, U.S. Steel believes that because salvage proceeds *cannot* be subtracted from the $700/ton limitation, and because it is entitled to all salvage proceeds, it is entitled to $700 per ton *plus* salvage, apparently without any limit.[14] *See id.* As Imperial's counsel noted in oral argument, this reading would lead to the odd result that Imperial or ACBL would have been just as well off had it left the coils at the bottom of the river, because any proceeds would have just gone into the pockets of U.S. Steel on top of the contractual payout it would already be receiving. This result would either encourage waste (by leaving the coils at the bottom of the

---

[14] As long as the coils are not somehow worth more damaged than they were undamaged, which is the only way that salvage proceeds could exceed actual market value.

river) or give a windfall to U.S. Steel (by awarding it $700 per ton *plus* salvage, with no apparent upward limitation). The Court sees no reason based on the contract or case law to do either. It is apparent from the language of the contract (and a logical and common sense consideration of its consequences) that "not in excess of $700/ton" became by agreement *the* valuation of the steel coils as between U.S. Steel and Imperial, and thus it must be the proper starting point for the maximum damage valuation from which any salvage proceeds may be deducted.

Turning to U.S. Steel's second argument, the Court does note that, at present, the salvage proceeds of about $640,000 are not in the hands of U.S. Steel, but apparently ACBL. The Court understands both U.S. Steel and Imperial to agree that U.S. Steel's recovery against Imperial may only be reduced by salvage proceeds U.S. Steel has actually received, and not by salvage proceeds that are in the hands of another. Thus, at present and as between Imperial and U.S. Steel, Imperial's potential damage liability remains at the full amount of $700/ton multiplied by the number of tons that U.S. Steel lost. Funds in the hands of ACBL are irrelevant to the determination of U.S. Steel's damages as against Imperial – the fact that steel coils have been recovered by ACBL and converted to cash does not alter Imperial's liability to U.S. Steel. Either way, the end result will be that U.S. Steel recovers an amount not more than $700 per ton of steel lost, consistent with the terms of the Contract of Affreightment.

Therefore, Imperial's Motion for Partial Summary Judgment is granted to the extent that the measure of its potential liability to U.S. Steel is limited to $700 per ton of cargo, in excess of which U.S. Steel may not recover, whether by receipt of salvage proceeds or otherwise. Imperial's liability to U.S. Steel would not be reduced by salvage proceeds that have been recovered and retained by any entity other than U.S. Steel (in particular, including the $640,348.26 presently retained by ACBL).

18

## III.   CONCLUSION

For the reasons stated above, the valuation and limitation on liability of $700 per ton of cargo memorialized in Paragraph 15 of the Contract of Affreightment between U.S. Steel and ACBL applies to Imperial Towing, Inc. and/or the M/V Carl L. Johnson. Imperial's liability to U.S. Steel is limited to a maximum of $700 per ton of steel coils lost multiplied by the number of tons of steel coils lost. An appropriate order will follow.

Mark R. Hornak
United States District Judge

Dated: November 6th, 2012
cc:     All counsel of record